**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TONY DELACRUZ, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 2:07-cv-02103-GP |
| | : | |
| v. | : | |
| | : | |
| PICCARI PRESS, INC. | : | |
| | : | |
| and | : | |
| | : | |
| CONSOLIDATED GRAPHICS, INC., | : | |
| | : | |
| Defendants. | | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, Consolidated Graphics, Inc. ("CGX") and Piccari Press, Inc. ("Piccari") (collectively, the "Defendants"), by and through their undersigned counsel, Dilworth Paxson LLP, respectfully submit this Memorandum of Law in further support of their Motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing with prejudice all claims of Plaintiff, Tony Dela Cruz ("Mr. Dela Cruz").

## I.    PRELIMINARY STATEMENT

Mr. Dela Cruz contends in his Complaint that the Defendants discriminated against him and harassed him because he is Hispanic, and retaliated against him because he engaged in protected conduct by filing an EEOC Charge against a subsidiary of CGX, Tursack, Inc. ("Tursack") (Tursack is not a party to this lawsuit), and because he opposed discriminatory and

retaliatory actions directed at an African-American that he supervised who was employed by Tursack during his tenure.[1]

Mr. Dela Cruz contends that Tursack terminated him based on discriminatory and/or retaliatory reasons.  In reality, Tursack terminated Mr. Dela Cruz for informing other employees he intended to resign from his job, because he had already walked off the job once before, and because he was disparaging both Tursack and its employees.  Mr. Dela Cruz admits to the facts that resulted in his termination.  Tursack terminated a Caucasian employee for threatening to leave the company when issues relating to his performance were reviewed with him.  Mr. Dela Cruz's testimony explicitly contradicts his own conjectures that he was terminated for refusing to discriminate or retaliate against an African-American employee that he supervised, named Kevin Brown ("Mr. Brown").  Additionally, Mr. Dela Cruz alleges Tursack's parent corporation, CGX, is liable for the actions of Tursack, but Mr. Dela Cruz has not bothered to do any meaningful discovery, such as depose witnesses, to gather evidence in support of this liability theory.

The second half of Mr. Dela Cruz's Complaint contains allegations involving Piccari, another subsidiary of CGX in the printing business.[2]  Piccari hired Mr. Dela Cruz for the night shift following his termination from Tursack.  Mr. Dela Cruz alleges Piccari thereafter demoted him based on either his race and/or in retaliation (1) for filing an EEOC Charge against Tursack and/or for (2) opposing Tursack's allegedly discriminatory or retaliatory actions towards Mr.

---

[1]     On June 25, 2007, the Defendants filed a Motion to Strike all Complaint allegations referring to Tursack based in pertinent part on the fact that Tursack was not a party to the lawsuit.   This Court's October 25, 2007 Order denied the Defendants' Motion to Strike.  [See October 25, 2007 Order.]  Mr. Dela Cruz asserted that he intended to add Tursack as a defendant to this action after he received his right-to-sue letter from the EEOC.  Despite the fact that the right-to-sue letter was issued to Mr. Dela Cruz on August 22, 2007, Tursack has never been added as a defendant to this lawsuit.  Additionally, while the Defendants address Mr. Dela Cruz's allegations against Tursack in this Motion for Summary Judgment, the claims against Tursack and CGX based on Mr. Dela Cruz's employment at Tursack should be dismissed based on the simple fact that Tursack is not a party to this lawsuit.

[2]     Mr. Dela Cruz alleges that CGX is liable for the acts of Piccari, despite having no evidence to support this liability theory.

Brown, although absolutely no evidence exists that shows a demotion even occurred.  To the contrary, although he claims that he was hired as a supervisor, both the advertisement for the job and the job application refer to a bindery operator position, the position he held throughout his employment, and not a supervisory position.  Mr. Dela Cruz admits that he was the only regular employee on that shift.  The bindery operator position was the only position Mr. Dela Cruz held for the four and 1/2 weeks he worked at Piccari, and therefore, the demotion claim is entirely unsupported by the facts. [3]

Mr. Dela Cruz also alleges that Piccari reduced his hours out of discriminatory and/or retaliatory animus, resulting in a constructive discharge.  Thereafter, Mr. Dela Cruz alleges that Piccari then retaliated against him by sabotaging his ability to find a new job by providing a reference to Mr. Dela Cruz's would-be employer, Cadmus Communications, Inc. ("Cadmus"), whereby Piccari told Cadmus not to hire Mr. Dela Cruz because he had filed an EEOC Charge against Tursack.  No evidence supports either of these allegations of discrimination or retaliation.  Mr. Dela Cruz's testimony is consistent with the testimony of Piccari that Mr. Dela Cruz's hours were reduced because the amount of work available on the machines he operated decreased.  Mr. Dela Cruz's shift hours were cut consistent with company policy and practice that has been uniformly applied since its inception.  Mr. Dela Cruz himself admits that the printing business is slow during December and January, the exact same timeframe when Mr. Dela Cruz's hours were reduced.  In fact, Mr. Dela Cruz admits that he took the job at Piccari (which was inconvenient to him based on its location) because Piccari was the only printing company that was actually hiring at that slow time of year.  Mr. Dela Cruz told Piccari when he resigned four and 1/2 weeks later that he did so to take a job at Cadmus because it was closer to home.

---

[3]     Curiously, the only reference to a demotion is in a resume Mr. Dela Cruz produced during discovery.  Mr. Dela Cruz admitted that he misstated the actual facts in that resume by stating that he "went to another facility." [Statement ¶¶ 66-67.]

At Mr. Dela Cruz's deposition, Mr. Dela Cruz contradicted many of the facts set forth in his Complaint. The absence of evidence in this case supporting Mr. Dela Cruz's claims is underscored by Mr. Dela Cruz's wholesale failure to prosecute his case. Mr. Dela Cruz failed to depose any witnesses in this case, and discovery has now closed. Because absolutely no facts exist which support Mr. Dela Cruz's allegations, summary judgment is the appropriate stage at which to dismiss this case.

## II.     SUMMARY OF FACTS AND PROCEDURAL HISTORY[4]

### A.     Mr. Dela Cruz's Employment with Tursack

Mr. Dela Cruz was hired by Tursack in March 2005 as a night shift bindery operator supervisor. [Statement ¶8.] On Mr. Dela Cruz's first day of work at Tursack, his supervisor, Mr. Ronald Fink ("Mr. Fink") (Caucasian), the Bindery Manager of the day shift, gave Mr. Dela Cruz background information on the five bindery operators Mr. Dela Cruz would be responsible for supervising, including Mr. Brown. [Statement ¶¶9-11.]

Mr. Fink told Mr. Dela Cruz, that Mr. Brown, who had been working at Tursack for two years at that point, was performing poorly. [Statement ¶¶12-13.] Mr. Dela Cruz agrees that Mr. Brown's performance was not up to par, and admits that he told Tursack's Vice President of Operations, Paul Sebastian ("Mr. Sebastian") (Caucasian), as well as Mr. Fink, that Mr. Brown performed poorly. [Statement ¶¶16-18.]

Mr. Dela Cruz alleges in his Complaint that he was terminated for not retaliating against Mr. Brown, who filed an EEOC Charge against Tursack. [Statement ¶19.] There is absolutely no evidence that Mr. Dela Cruz was asked to or expected to retaliate against Mr. Brown, nonetheless that Mr. Dela Cruz was terminated for failing to retaliate against Mr. Brown. There

---

[4]     The facts upon which this Motion is based are contained in Defendants' Statement of Undisputed Facts (the "Statement"). What follows in this section is a summary of those facts.

is absolutely no evidence that Mr. Dela Cruz voiced his opposition to any perceived discrimination or retaliation directed towards Mr. Brown.  Mr. Dela Cruz testified that no one ever told him to treat Mr. Brown any differently than any of the other employees at Tursack. [Statement ¶20.]  In fact, Mr. Dela Cruz testified that before Mr. Brown filed an EEOC Charge, Mr. Fink told him to get rid of Mr. Brown, but in approximately June 2005, <u>after</u> Mr. Brown filed an EEOC Charge, Tursack told him to <u>keep Mr. Brown employed</u>.  [Statement ¶¶14-15; 21.]  This directive by Tursack directly contradicts Mr. Dela Cruz's assertions that he was expected to retaliate against Mr. Brown.  Mr. Dela Cruz admits that the directive to keep Mr. Brown employed took place almost six months before he was terminated.  [Statement ¶¶21-22; 36.]  In light of all the business concerns articulated by Tursack as to the grounds for Mr. Dela Cruz's termination, Mr. Dela Cruz cannot meet the burden of showing pretext related to the alleged protected conduct that he claims occurred over six months before he was terminated.

To the contrary, the evidence shows that Mr. Dela Cruz was terminated for speaking poorly about Tursack and threatening to quit his job when issues of his performance were raised. [Statement ¶¶23-36.]  Mr. Dela Cruz admitted that he had a problem meeting his production goals at Tursack.  [Statement ¶23.]   Mr. Dela Cruz admitted that within the very first month of Mr. Dela Cruz's employment with Tursack, Mr. Fink spoke to Mr. Dela Cruz about his production problems.  [Statement ¶24.]  Mr. Dela Cruz pinned the blame for his failure to meet production goals on the bindery operators he supervised, and admits that he complained to Mr. Fink that the employees on his shift were the worst employees at Tursack and that they were some of the worst employees he had ever seen.  [Statement ¶¶25-26.]

Mr. Dela Cruz acknowledges that he would not accept directions from Mr. Fink, his supervisor at Tursack, because he did not agree with the way Mr. Fink ran the bindery.

[Statement ¶¶27; 31-32.]   Mr. Fink reported to Mr. Sebastian.  Mr. Dela Cruz reported to Mr. Fink.  Mr. Dela Cruz could not accept Mr. Fink's authority, even going so far as to complain to Mr. Sebastian that Mr. Fink ran the bindery poorly.  [Statement ¶¶9; 27-32.]  Mr. Dela Cruz was also prone to angry outbursts when his supervisors sought to exercise their authority.  [Statement ¶29.]  Mr. Dela Cruz testified that when Mr. Fink gave him a production schedule he would "handle it the way I wanted to handle it.  If I wanted to put one job in another equipment, I would handle it my way."  [Statement ¶27.]  Mr. Dela Cruz admitted that Mr. Fink told him on multiple occasions not to deviate from Mr. Fink's production schedule.  [Statement ¶28.]  On one occasion where Mr. Dela Cruz was reprimanded by Mr. Fink for not following the production schedule, Mr. Dela Cruz became angry and quit, walking off the job right after his shift had begun.  [Statement ¶29.]  Later that same day, Mr. Dela Cruz telephoned Mr. Sebastian and requested his job at Tursack back.  Mr. Sebastian agreed to give Mr. Dela Cruz another chance.  [Statement ¶30.]  Mr. Dela Cruz's insubordination and lack of respect for the chain of command at Tursack continued, however.  In the time period right before Mr. Dela Cruz was terminated from Tursack, Mr. Dela Cruz was leaving work half an hour early, without permission.  [Statement ¶33.]  Mr. Dela Cruz told other Tursack employees that he was going  to resign from his position at Tursack by submitting a letter of resignation.  [Statement ¶¶34-35.]  At this point, Mr. Sebastian decided to terminate Mr. Dela Cruz for informing other employees he intended to resign from his job, because he had already walked off the job once before, and because he was speaking poorly about Tursack management and Tursack's employees.  [Statement ¶¶23-36.]

Tursack treated Mr. Dela Cruz the same as its other employees. Mr. Sebastian terminated a Caucasian employee who threatened to quit in a meeting that addressed performance problems.

Specifically, Mr. Sebastian terminated Robert Way ("Mr. Way") (Caucasian) within a year of Mr. Dela Cruz's termination, because Mr. Way told Mr. Sebastian that he was looking for another job during a meeting regarding Mr. Way's job performance.  [Statement ¶37.]

### B.    Mr. Dela Cruz is Hired by Piccari as a Bindery Operator

After Mr. Dela Cruz lost his job at Tursack, he applied to Piccari for a position as a bindery operator (not supervisor), after becoming aware of the job opening for a bindery operator (not supervisor) through an advertisement in the newspaper.  [Statement ¶¶39-42.]  Mr. Dela Cruz submitted his resume to Piccari and thereafter submitted an application for the bindery operator (not supervisor) position at Piccari.  [Statement ¶¶41-42.]

Mr. Dela Cruz testified that he applied to Piccari (a company that was one hour and twenty minutes away that he admitted was the only company with a job opening) because it was the only printing plant hiring during the holidays.  [Statement ¶¶43; 62.]  Mr. Dela Cruz explained that the printing industry is slow during the holidays, which he defines as "December through January."  [Statement ¶¶43-44.]  Mr. Dela Cruz's entire employment with Piccari was limited to these slow months, months when Mr. Dela Cruz says printing businesses typically "cut" workers' hours.  [Statement ¶¶4; 7; 44.]

Piccari hired Mr. Dela Cruz as the sole regular night shift bindery operator in late December 2005, after Piccari's Vice President of Operations, Tony Figorski ("Mr. Figorski") (Caucasian), met with Mr. Dela Cruz in person.  [Statement ¶45-47.]

Mr. Dela Cruz testified that on his first day of work, Mr. Figorski told him that he knew Mr. Dela Cruz had been terminated from Tursack, but that he was going to put him to work at Piccari regardless of that fact.  Mr. Dela Cruz admits that after he had this conversation with Mr. Figorski, he worked a forty-hour week.  [Statement ¶¶48-52.]  In fact, Mr. Dela Cruz was given overtime after he had this conversation with Mr. Figorski.  [Statement ¶53.]  No facts in evidence

show Mr. Dela Cruz was treated any differently by Piccari based on Piccari's knowledge of his employment and termination from Tursack.

### C.    Mr. Dela Cruz's Hours Are Reduced Because Piccari's Business Drops Off

Piccari runs both day shifts and night shifts.   While Mr. Dela Cruz worked at Piccari, there was a day shift that consisted of four operators who did the same exact job as Mr. Dela Cruz.   [Statement ¶57.]   Piccari's policy is to staff its facility in a lean manner.   Thus, staffing needs are closely monitored at Piccari; meetings are routinely held at Piccari where staffing needs are discussed.   [Statement ¶58.]   When the amount of work available for a particular machine lessens, Piccari's policy is to reduce the amount of work available on the night shift before reducing the amount available on the day shift.   [Statement ¶58.]

When the work available on the machines Mr. Dela Cruz worked at lessened, in accordance with Piccari policy, the work available on the night shift was the first shift impacted. Because Mr. Dela Cruz worked during the night shift and was the lone worker during the night shift, Mr. Dela Cruz's hours were reduced as a result of the reduced amount of work available on the equipment Mr. Dela Cruz could run.   [Statement ¶¶59-60.]   When Mr. Dela Cruz's hours were reduced, Mr. Figorski assured Mr. Dela Cruz that Piccari would increase his hours when the work available on the machines he operated increased.   [Statement ¶61.]

### D.    Mr. Dela Cruz Voluntarily Resigns from Piccari

Mr. Dela Cruz admits that Piccari was the only printing company in the area that was hiring during the holidays.   [Statement ¶44.]   Piccari was one hour and twenty minutes away from Mr. Dela Cruz's home, which Mr. Dela Cruz admits was problematic for him.   [Statement ¶63.] As a result, beginning on January 23, 2006 (at the end of what Mr. Dela Cruz identified as the slow season), or approximately one month into his employment with Piccari, Mr. Dela Cruz began looking for a new job that was closer to his home.   [Statement ¶¶63-64.]   A printing

company called Cadmus Communications, Inc. ("Cadmus") was only twenty minutes from Mr. Dela Cruz's home. [Statement ¶65.]  Mr. Dela Cruz submitted a copy of his resume to Cadmus. [Statement ¶66.]  Mr. Dela Cruz's resume stated that his reason for leaving Tursack was because he "went to another facility."  Mr. Dela Cruz admits that this statement is untrue.  [Statement ¶67.]  Mr. Dela Cruz admits he misrepresented the truth because he wanted to hide his termination from Tursack, from his potential new employer, Cadmus.[5]  [Statement ¶68.]

According to Mr. Dela Cruz, after he received a job offer from Cadmus, he resigned from Piccari.  [Statement ¶71.]  Cadmus, on the other hand, has specifically denied that it ever offered Mr. Dela Cruz a job.  [Statement ¶76.]  Mr. Dela Cruz told Piccari that the reason he was resigning was because he had found a job closer to home.  [Statement ¶¶71; 74.]  According to Mr. Dela Cruz, about two days after Mr. Dela Cruz notified Piccari of his resignation, Mr. Dela Cruz's drug test at Cadmus was cancelled, and it was never rescheduled.  [Statement ¶75.]   Mr. Dela Cruz has testified that about one month later, Cadmus employee Beverly Neff ("Ms. Neff") told him that his supervisor at Piccari, Brian Lewandowski ("Mr. Lewandowski") (Caucasian), gave Mr. Dela Cruz a "bad" reference, but has absolutely no evidence to support his conjecture that this allegedly "bad" reference was unfair, nonetheless retaliatory.  [Statement ¶78.]  Neither Tursack nor the Defendants had received notice of Mr. Dela Cruz's EEOC Charge at the time when the reference was allegedly provided to Cadmus.  Specifically, neither Piccari nor Tursack were aware of Mr. Dela Cruz's EEOC Charge against Tursack, dated May 11, 2006 (more than three months <u>after</u> Mr. Dela Cruz alleges Piccari retaliated against him), until sometime after May 11, 2006.  [Statement ¶¶75-85.]

---

[5]       One subsequent resume belonging to Mr. Dela Cruz provides yet another misleading reason for Mr. Dela Cruz's separation from Tursack: "voluntary quit (bad management)."  [Statement ¶69.]  Mr. Dela Cruz testified at his deposition about yet another resume he had used in the past, which indicated that he worked for King Lithography during the time period in which he worked for Tursack and Piccari.  He admitted that he "lie[d] on his resume. " [Statement ¶70.]

### E.      Summary of Mr. Dela Cruz's Claims

On these undisputed facts, Mr. Dela Cruz still maintains that the Defendants discriminated and retaliated against him and engaged in racial harassment.  He also claims the Defendants tortiously interfered with his existing or prospective contractual relations with Cadmus.  He bases those claims on the following "adverse employment actions":

| Contested Action | Relevant Citations in Statement |
|---|---|
| Terminated from Tursack in retaliation for refusing to engage in racial discrimination against Mr. Brown | ¶¶1-2; 8-38; 79-81; 84 |
| Demotion at Piccari from supervisor to operator in retaliation for Plaintiff's protected activity | ¶¶4; 39-51; 72-73; 79-84 |
| Reduction of work hours at Piccari in retaliation for Plaintiff's protected activity | ¶¶1-84 |
| Constructive discharge from Piccari in retaliation for Plaintiff's protected activity | ¶¶1-84 |
| Defendants contacted Cadmus, advised it of Plaintiff's EEOC Charge and other protected activity advised it not hire Plaintiff[6] | ¶¶8-22; 48-51; 64-85 |

Against these undisputed, material facts, Mr. Dela Cruz contends that the Defendants violated Title VII, 42 U.S.C. § 2000 *et seq.* ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951 *et seq.* ("PHRA"), and 42 U.S.C. § 1981 ("Section § 1981") by discriminating and retaliating against him because he is Hispanic and by engaging in racial harassment.[7]   Mr. Dela Cruz also asserts a claim for tortious interference with contractual relations based upon these same facts.  Neither the evidence nor the law supports those claims.

---

[6]      Mr. Dela Cruz bases his claim for intentional interference with existing or prospective contractual relations on these allegations.

[7]      On October 25, 2007, this Court dismissed Mr. Dela Cruz's discrimination claims based on national origin and the discrimination and retaliation claims brought under Title VII and the PHRA regarding the reference allegedly provided by the Defendants to Cadmus.  [See October 25, 2007 Order.]

Accordingly, Summary Judgment dismissing with prejudice all of Mr. Dela Cruz's claims is required.

## III.   LEGAL ARGUMENT

### A.   No Evidence Supports Mr. Dela Cruz's Allegations of the Existence of a Demotion or an Unlawful Job Reference; The Defendants Have Articulated Legitimate Nondiscriminatory Reasons For Mr. Dela Cruz's Termination and Reduction in Hours

#### 1.   The Legal Standard

Mr. Dela Cruz contends that the Defendants violated Section 1981, Title VII, and the PHRA by discriminating against him because he is Hispanic, retaliating against him, and by engaging in racial harassment.

Section 1981 discrimination claims and PHRA claims are governed by the same framework as Title VII discrimination claims.  Langley v. Merck & Co., 186 Fed. Appx. 258, 259 (3d. Cir. 2006); Kelly v. Drexel Univ., 94 F.3d 102, 104-05 (3d. Cir. 1996).  Thus, Mr. DelaCruz must prove facts sufficient to establish a *prima facie* case of discrimination under the familiar framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1972).  As part of Mr. Dela Cruz's *prima facie* case, he must allege some adverse employment action was taken against him.  Id.

Once he has established a *prima facie* case, the burden shifts to the Defendants to "articulate a legitimate, nondiscriminatory reason" for the alleged adverse employment action. Id.  Despite this shift in the burden of production, the ultimate burden of proving that the Defendants intentionally discriminated against Mr. Dela Cruz remains at all times with Mr. Dela Cruz.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-7 (1993).  The Defendants' burden in demonstrating a legitimate, nondiscriminatory reason is "rather light," and ordinarily, unless silent, a defendant "will almost always meet its burden."   Tex. Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 255 (1981); Salkovitz v. Pioneer Electronics (USA), Inc., 2005 WL 1638131 at *4 (D.N.J. 2005).  Once the Defendants meet this burden, Mr. Dela Cruz loses the presumption of discrimination established by his *prima facie* case.  Burdine, 450 U.S. at 255.

Likewise, Section 1981 and PHRA retaliation claims are analyzed similar to Title VII retaliation claims.  Hutchins v. UPS, 197 Fed. Appx. 152, 156 (3d Cir. 2006); Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).  Specifically, Mr. Dela Cruz must prove that he engaged in protected conduct for which the Defendants imposed an action that was materially adverse to a reasonable employee.  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  Mr. Dela Cruz must establish a causal connection between his participation in the protected activity and the adverse action as part of his *prima facie* retaliation case.  McKenna v. Philadelphia, 461 F.3d 331, 340-341 (3d Cir. 2006).  Once Mr. Dela Cruz establishes those elements, the Defendants can produce evidence (not prove) that it imposed the adverse employment action for legitimate reasons.  Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. Pa. 2006).

To survive summary judgment, on his discrimination and retaliation claims, Mr. Dela Cruz must then establish a material, genuine issue of fact that casts substantial doubt on the Defendants' legitimate reasons that would support a jury finding that those reasons are pretextual.  Id.  In other words, Mr. Dela Cruz must establish, by a preponderance of the evidence, that the Defendants' proffered reasons were merely a pretext for discrimination or retaliation, and not the real motivation for the unfavorable job action.  Burdine, 450 U.S. at 253.

To discredit the Defendants' proffered legitimate, non-discriminatory reasons, Mr. Dela Cruz cannot simply show that the Defendants' decision was wrong or mistaken, since the factual dispute at issue is *not* whether the employer is wise, shrewd, prudent, or competent.  Fritchett v.

Stroehmann Bakeries, Inc., No 95-284, 1995 U.S. Dist. LEXIS 13862 at * 15 (E.D. Pa. Sept. 20, 1995).  By contrast, to avoid summary judgment, Mr. Dela Cruz's evidence must allow a fact-finder to reasonably infer that *each* of the employer's preferred reasons was either a post-hoc fabrication, or that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Fuentes v. Perski, 32 F.3d 759, 765 (3d. Cir. 1994) ("[t]o demonstrate pretext, a plaintiff must demonstrate…weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employers' preferred legitimate reasons [such that a] reasonable factfinder could rationally find the reasons 'unworthy of credence,' and hence infer that the employer did not act for the asserted nondiscriminatory reasons"); see also Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d. Cir. 1998).  Simply put, proving pretext "places a difficult burden on [Mr. Dela Cruz]." Helfrich v. Lehigh Valley Hosp., No. 03-05793, 2005 WL 1715689 (E.D. Pa. July 21, 2005).

Mr. Dela Cruz cannot satisfy this burden because he has not produced any evidence to support an inference that any of the Defendants' reasons for the alleged adverse actions were pretext for race discrimination or retaliation.  See Jackson v. Dana Corn., No. 98-5431, 1999 U.S. Dist. LEXIS 17380 at *22-23 (E.D. Pa. Nov. 9, 1999) (granting summary judgment to defendant where plaintiff "failed to present any evidence which either casts doubt on defendant's explanation for its actions, or even suggests, much less establishes, . . . discrimination was the cause of defendant's actions.")  Mr. Dela Cruz has offered nothing more than his own subjective belief and speculation to demonstrate that the Defendants acted out of racial animus.  See Warner v. Montgomery Twp., No. 01-3309, 2002 U.S. Dist. LEXIS 13257 at *47-48 (E.D. Pa. July 22, 2002) (granting summary judgment because, except for plaintiff's "bare allegations," the record was devoid of any evidence that suggested defendant racially discriminated against plaintiff.)  A

party opposing summary judgment must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine issue.  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  See also N.L.R.B. v. FES, 301 F.3d 83, 95 (3d Cir. 2002) (unsupported, conclusory statements are insufficient proof on summary judgment); Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981) (same).

The Defendants submit, that Mr. Dela Cruz cannot sustain his burden of establishing a genuine material issue of fact to cast sufficient doubt on the Defendants' legitimate decisions. Accordingly, Summary Judgment dismissing with prejudice Mr. Dela Cruz's Section 1981, Title VII, and PHRA discrimination and retaliation claims is required.

### 2. The Defendants Cannot be Held Liable for Any Claims Arising from Mr. Dela Cruz's Employment with Tursack; Additionally, Mr. Dela Cruz was Terminated from Tursack for Legitimate Business Reasons

Because Tursack is not a party to this lawsuit, and because Mr. Dela Cruz cannot point to any evidence of record showing that CGX is liable for the actions of its subsidiary, Mr. Dela Cruz's claims related to his allegations that his termination from Tursack was done for discriminatory or retaliatory reasons must be dismissed.

Mr. Dela Cruz has chosen not to name Tursack as a defendant in this action.  [Statement ¶1.] Liability under the relevant discrimination statutes can only attach to a plaintiff's employer who engaged in conduct prohibited by these statutes.  Although Tursack, not CGX, employed Mr. Dela Cruz in 2005, Mr. Dela Cruz has failed to make Tursack a party to this lawsuit.  [See Complaint.] Additionally, Mr. Dela Cruz cannot point to any evidence rendering CGX, who is a party to this lawsuit, liable for the acts of its subsidiary, Tursack, as described in Section (III)(E) of this Memorandum of Law.  Therefore, Mr. Dela Cruz's claims against the Defendants actually

named in this action – Piccari and CGX – as they relate to Mr. Dela Cruz's employment and termination from Tursack, must be dismissed.

Assuming, *arguendo*, that CGX were liable for the acts of Tursack, Mr. Dela Cruz has not established a *prima facie* case for retaliation, where the retaliation is against someone for opposing a practice that is unlawful under Title VII. McKenna, 461 F.3d 331. Specifically, Mr. Dela Cruz must prove that he engaged in protected conduct for which the Defendants imposed an action that was materially adverse to a reasonable employee. Burlington Northern, 548 U.S. 53. With respect to the "protected conduct" activity prong, Mr. Dela Cruz's opposition to the unlawful discrimination or retaliation must not be equivocal. McKenna, at 340-341. Mr. Dela Cruz can point to no evidence showing his opposition to discrimination or retaliation against Mr. Brown was unequivocal.

Nor can Mr. Dela Cruz establish a causal connection between his participation in the protected activity and the adverse employment action. McKenna, at 340-341. Mr. Dela Cruz admits that he was never told to treat Mr. Brown any differently than anyone else at Tursack. [Statement ¶20.] In fact, Mr. Dela Cruz stated that in June he was specifically told to keep Mr. Brown employed after Mr. Brown filed his EEOC Charge against Tursack. [Statement ¶21.] Mr. Dela Cruz contends he was then terminated for failing to retaliate against Mr. Brown, nearly six months after Mr. Dela Cruz was allegedly told to keep Mr. Brown employed. [Statement ¶¶19-22.] A significant gap in time between the proximity of the protected activity and the adverse action is suggestive that the protected activity did not provoke the adverse action. Todd v. New England Motor Freight, 2004 U.S. Dist. LEXIS 7099, at 13 (E.D. Pa. April 20, 2004) (holding three and 1/2 months between complaints and termination suggestive that complaints of harassment did not provoke termination).

Even if Mr. Dela Cruz could state a *prima facie* case, Tursack and CGX had a legitimate business reason for terminating Mr. Dela Cruz.  See Moore, at 342.  The evidence shows that Mr. Dela Cruz was terminated by Mr. Sebastian for speaking poorly about Tursack and threatening to quit his job.  [Statement ¶¶23-36.] Mr. Dela Cruz spoke poorly about Tursack by blaming his subordinates for his failings as a supervisor, and by criticizing the competence of his superiors both to Tursack management and to his direct reports.  [Statement ¶¶23-32; 34.]  Against a backdrop of insubordination, including instances where Mr. Dela Cruz left work early without permission and intentionally ignored the production schedule, Mr. Dela Cruz told other Tursack employees that he was planning to resign from his position at Tursack, and would be submitting his letter of resignation.  [Statement ¶¶27-35.]  Because Mr. Dela Cruz's statements about the company to subordinates was related to the very issues that were discussed as problematic when Mr. Dela Cruz quit previously and raised concerns about his reliability, Mr. Sebastian decided to terminate Mr. Dela Cruz.  [Statement ¶¶23-36.]  Termination under these facts constitutes a legitimate business reason.  There is no evidence to support his claim that his decision was in any way related to his race on to any protected conduct.

More importantly, Mr. Dela Cruz cannot point to any evidence of pretext to overcome Tursack's legitimate business reason for terminating him.  See Burdine, 450 U.S. at 253.  In the context of a retaliation claim, the United States Court of Appeals for the Third Circuit typically looks to an external comparator in examining pretext on subjective criteria.  Constant v. Mellon Fin. Corp., 2007 U.S. App. LEXIS 21991 at * 18 (3d Cir. September 7, 2007).  Mr. Dela Cruz was treated in the same manner as other Tursack employees.  Mr. Sebastian terminated Mr. Way, a Caucasian employee, for the same reason he terminated Mr. Dela Cruz.  During a meeting regarding Mr. Way's performance, Mr. Way told Mr. Sebastian that he was looking for another

job.  Mr. Sebastian terminated Mr. Way.  [Statement ¶37.]  The facts leading up to Mr. Dela Cruz's termination were considerably more severe than the facts surrounding Mr. Way's termination, as Mr. Dela Cruz had actually quit once before and had been given a second chance. Additionally, Mr. Dela Cruz, who as a supervisor was in a position of authority at Tursack, was creating an atmosphere of poor morale by refusing to follow directions from his supervisors, stating that Mr. Fink ran the bindery poorly and otherwise speaking poorly about Tursack and its employees, and stating to his subordinates that he was going to leave the company.

Because Tursack was <u>never added as a defendant</u> and because the facts do not support either a *prima facie* case nor provide pretext once Tursack's business rationale for terminating Mr. Dela Cruz is articulated, the claims related to Mr. Dela Cruz's employment with Tursack must be dismissed with prejudice.

### 3.    <u>Mr. Dela Cruz Was Not Demoted by Piccari</u>

Mr. Dela Cruz cannot point to any evidence supporting his allegations that he was ever demoted while employed by Piccari, nonetheless point to any evidence that this alleged demotion was done for discriminatory or retaliatory reasons.  Because Mr. Dela Cruz cannot show a demotion actually occurred, all of his claims related to this alleged demotion must be dismissed.

In order for Mr. Dela Cruz to make a *prima facie* claim under the discrimination statutes he cites to in his Complaint, there must have been some <u>adverse action</u> taken against him by his employer.  <u>McDonnell Douglas</u>, at 802 (stating requirement for an adverse employment action in a discrimination claim); <u>Burlington Northern</u>, 548 U.S. 53 (stating requirement for an action that is materially adverse to a reasonable employee in a retaliation claim).  While Mr. Dela Cruz

alleges in his Complaint that he was demoted from a bindery operator supervisor position to a bindery operator position, all of the evidence shows that no demotion ever took place.[8]

Mr. Dela Cruz was hired as a "bindery operator" and remained in that position until he resigned from Piccari.  [Statement ¶¶39-42.] The evidence is clear that Mr. Dela Cruz <u>applied</u> to work as a bindery operator.  [Statement ¶¶39-42.]  Mr. Dela Cruz's application for employment with Piccari, filled out in his own handwriting, and bearing his signature, indicates he applied for the position of "bindery operator."  [Statement ¶¶42-43.]  Mr. Dela Cruz admitted that he was the sole regular employee on the night shift, circumventing the need for a supervisor at all. [Statement ¶48.]  The evidence is clear that Mr. Dela Cruz was <u>hired</u> as a bindery operator. [Statement ¶¶40-43.]  Because he was a bindery operator when he resigned four and 1/2 weeks later, no demotion could have occurred.[9]  [Statement ¶¶5-6.]

Mr. Dela Cruz's assertions fail to constitute facts sufficient to survive Summary Judgment.  <u>Celotex</u>, at 324.  Because Mr. Dela Cruz can point to no evidence showing an adverse action (that he was demoted), no dispute of material facts exists with respect to Mr. Dela Cruz's demotion claims, and therefore these claims must be dismissed with prejudice.

### 4.    Mr. Dela Cruz's Hours Were Reduced for Legitimate Business Reasons

---

[8]    The only reference to a demotion is in a resume Mr. Dela Cruz produced during discovery.  Mr. Dela Cruz admitted that he misstated the actual facts of his separation from Tursack in that resume by stating that he "went to another facility," when he had in fact been terminated.  [Statement ¶¶66-67.]  Mr. Dela Cruz was a supervisor at Tursack before he obtained a position as an operator at Piccari.  The misstatement on his resume that he had been transferred from Tursack to Piccari, and thus transferred from the supervisor position to the operator position, could be construed as a "demotion" when he began work as an operator at Piccari.  [Statement ¶¶66-67.]

[9]    Because no demotion occurred, and thus no *prima case* exists with respect to the demotion claims, the Defendants cannot engage in the burden-shifting analysis under <u>McDonnell Douglas</u> that includes Defendants' proffer of a legitimate business reason for taking the adverse action.

While Mr. Dela Cruz's hours were reduced, these reductions were done for a legitimate business reason.  Absolutely no evidence of pretext exists to support Mr. Dela Cruz's allegations that these reductions were linked to discriminatory or retaliatory animus.

With respect to Mr. Dela Cruz's allegations that his hours were reduced because he opposed actions relating to Mr. Brown that he perceived as unlawful, he cannot establish a *prima facie* case for retaliation, where the retaliation is against someone for opposing a practice that is unlawful under Title VII.  McKenna, 461 F.3d 331.  As stated previously, Mr. Dela Cruz's opposition to the unlawful discrimination or retaliation must not be equivocal. McKenna, at 340-341.  Mr. Dela Cruz can point to no evidence showing his opposition to discrimination or retaliation against Mr. Brown was unequivocal, with the exception of the EEOC Charge he filed against Tursack, which Tursack and the Defendants had no notice of until over three months after Mr. Dela Cruz resigned from Piccari.

Nor can Mr. Dela Cruz establish a causal connection between his participation in the protected activity and the adverse employment action (the reduction in hours).  McKenna, at 340-341.  As explained in Section (III)(A)(2) above, Mr. Dela Cruz stated that in approximately June 2005, after Mr. Brown filed his EEOC Charge against Tursack, he was specifically told to keep Mr. Brown employed.  [Statement ¶¶14-15; 21.]  Thus any directive by Tursack to "get rid of" Mr. Brown occurred more than seven months before Mr. Dela Cruz's hours were reduced by Piccari.  Additionally, no causal connection can be made between Mr. Dela Cruz's EEOC Charge against Tursack when Tursack and the Defendants had no notice of the EEOC Charge until over three months after Mr. Dela Cruz resigned from Piccari.

Nor is there any causal connection between the telephone conversation conducted by Mr. Sebastian and Mr. Figorski regarding Mr. Dela Cruz's termination from Tursack, and the

reduction in hours.  Mr. Dela Cruz's unsupported theory is that Mr. Figorski learned Mr. Dela Cruz had "refused to retaliate against Mr. Brown" at Tursack from Mr. Sebastian, based on a conversation that Mr. Figorski had with Mr. Dela Cruz on his <u>first day of work</u> at Piccari.[10]  Mr. Dela Cruz testified that he worked forty hours during his first week at Piccari, and that his hours were reduced during subsequent weeks.  Thus, absolutely no connection can be made between the date that Piccari allegedly learned of Mr. Dela Cruz's protected conduct (Mr. Dela Cruz's first day of work), and the date Piccari started to reduce Mr. Dela Cruz's hours.  If Piccari was so intent on retaliating against Mr. Dela Cruz for engaging in allegedly protected conduct at Tursack, wouldn't Piccari have simply terminated Mr. Dela Cruz on his first day of work, excusing such action on the fact that Mr. Dela Cruz had just been fired from his last job for performance reasons?  To the contrary, Mr. Dela Cruz admits that when his hours were reduced, Mr. Figorski assured him that Piccari would increase his hours when the work available on the machines he operated increased.  [Statement ¶¶43-84.]

Even if Mr. Dela Cruz had stated a *prima facie* case, Piccari had a legitimate business reason for reducing Mr. Dela Cruz's hours.  <u>See</u> <u>Moore</u>, at 342.  When the work available on the machines Mr. Dela Cruz worked at lessened, in accordance with Piccari policy, the work available on the night shift was the first shift impacted.  Because Mr. Dela Cruz worked during the night shift and was the lone worker during the night shift, Mr. Dela Cruz's hours were reduced as a result of the reduced amount of work available on the equipment Mr. Dela Cruz could run.  [Statement ¶¶57-61.]  Reducing Mr. Dela Cruz's work hours when the amount of

---

[10] Mr. Sebastian has testified that his conversation with Mr. Figroski was limited to the fact that Mr. Dela Cruz was terminated from Tursack for performance reasons Mr. Sebastian specifically denies telling Mr. Figorski that Mr. Dela Cruz had opposed discrimination or retaliation at Tursack or that Mr. Dela Cruz had engaged in any protected conduct at Tursack.  [Statement ¶48.]

work to be done has lessened, in accordance with company policy, constitutes a legitimate business reason for Piccari reducing Mr. Dela Cruz's hours.

Additionally, there is no evidence of pretext under <u>Burdine</u> to contradict Piccari's legitimate business reasons for reducing Mr. Dela Cruz's hours. <u>Id.</u>, at 253. Mr. Dela Cruz can put forth no evidence supporting the allegation that Piccari reduced Mr. Dela Cruz's hours because of discrimination or in retaliation for Mr. Dela Cruz engaging in protected conduct. Mr. Dela Cruz's allegations of racism and retaliation are particularly disingenuous considering his testimony that the printing industry is especially slow during the exact months in which these work reductions transpired. He was provided no factual support that the company's records that business slowed are inaccurate and cannot do so. "Bare assertions, conclusory allegations or suspicions" are not sufficient to create a genuine issue of fact on summary judgment. <u>Podobnik</u>, at 594.

Because the facts do not support either a *prima facie* case nor provide pretext once Piccari's business rationale for reducing Mr. Dela Cruz's hours is articulated, the claims related to Mr. Dela Cruz's reduction in hours must be dismissed with prejudice.

### 5. <u>The Allegedly "Bad" Reference</u>

#### a. <u>Retaliation Claims</u>

Mr. Dela Cruz cannot point to any evidence supporting his claims of harassment or retaliation as they relate to his unsupported allegations that the Defendants provided a reference to his would-be employer, Cadmus, advising Cadmus of Mr. Dela Cruz's EEOC Charge and other protected activity and advising Cadmus not to hire Mr. Dela Cruz.

Assuming, *arguendo*, that some sort of "bad" reference was provided to Cadmus by Mr. Lewandowski, and while the Defendants deny providing any sort of reference for Mr. Dela Cruz, Mr. Dela Cruz has failed to establish a *prima facie* case for retaliation, where the retaliation is

against someone for opposing a practice that is unlawful under Title VII.  <u>McKenna</u>, 461 F.3d 331.  As stated previously, Mr. Dela Cruz's opposition to the unlawful discrimination or retaliation must not be equivocal.  <u>McKenna</u>, at 340-341.  Mr. Dela Cruz can point to no evidence showing his opposition to discrimination or retaliation against Mr. Brown was unequivocal, with the exception of the EEOC Charge he filed against Tursack that Tursack and the Defendants had no notice of until <u>over three months after Mr. Dela Cruz resigned from Piccari</u>.

Nor can Mr. Dela Cruz establish a causal connection between his participation in the protected activity and the adverse employment action.  <u>McKenna</u>, at 340-341.  As explained in Section (III)(A)(2) above, Mr. Dela Cruz stated that in approximately June 2005, after Mr. Brown filed his EEOC Charge against Tursack, he was specifically told to keep Mr. Brown employed.  [Statement ¶¶14-15; 21.]  Thus any directive by Tursack to "get rid of" Mr. Brown occurred more than eight months before Piccari provided the alleged reference to Tursack.  Additionally, there is no evidence that Tursack ever told Piccari that Mr. Dela Cruz had refused to retaliate or discriminate against Mr. Brown.  [Statement ¶¶48-52.]  Mr. Dela Cruz alleges that Cadmus, in response to the alleged "bad" reference, failed to follow through with hiring him before his last day at Piccari.  Mr. Dela Cruz's last day at Piccari was February 1, 2006.  [Statement ¶7.]  Pertinently, neither Piccari nor Tursack were aware of Mr. Dela Cruz's EEOC Charge against Tursack, <u>dated May 11, 2006</u> (more than three months <u>after</u> Mr. Dela Cruz alleges Piccari retaliated against him) until sometime after May 11, 2006.  [Statement ¶¶75-84.]  Mr. Dela Cruz admits he has no personal knowledge that the Defendants advised Cadmus of his alleged protected conduct or his intent to file an EEOC Charge.  [Statement ¶85.]  Mr. Dela Cruz has obtained no evidence in discovery to support his allegations.

Thus, because Mr. Dela Cruz cannot establish a *prima facie* case with respect to his retaliation and harassment claims concerning the alleged reference provided to Cadmus, these claims must be dismissed with prejudice.

### b.      Tortious Interference Claim

Mr. Dela Cruz's tortious interference claim with respect to the reference allegedly provided to Cadmus must be dismissed as well.   In order to make a claim for tortious interference with present or prospective contractual relations, a plaintiff must establish the following:  "(1) [t]he existence of present or prospective contractual relations;  (2) [a]n intent on the part of the defendant to harm plaintiff by interfering with those contractual relations; (3) [t]he absence of a privilege or justification for the interference; and  (4) [d]amages." Koch v. AT&T, 1989 U.S. Dist. LEXIS 3945 at *7 (E.D. Pa. Apr. 12, 1989).  (dismissing plaintiff's claim for tortious interference for failing to plead the absence of a privilege). Id. at *6-7.

Pennsylvania courts are clear that a plaintiff bears the burden of proving, as part of his *prima facie* case, that a defendant's conduct was not justified.  Triffin v. Janssen, 626 A.2d 571, 574 n.3 (Pa. Super. Ct. 1993); Gresh v. Potter McCune Co., 344 A.2d 540, 541 (Pa. Super. Ct. 1975); accord Pastore v. Bell Telephone Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994); accord Klimiuk v. ESI Lederle, Inc., 2000 U.S. Dist. LEXIS 15647, *6-7 (E.D. Pa. Oct. 25, 2000). ("Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, the non-moving party cannot rely on conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact.").  Where the plaintiff has not offered sufficient evidence to carry this burden – i.e., where he fails to adduce evidence sufficient to permit a reasonable jury to conclude that the defendant's conduct was improper – summary judgment is properly granted.  University Graphics, Inc. v. Pro Image Corp., 913 F. Supp. 338, 345 (M.D. Pa. 1996) (finding argument to the contrary "incorrect" and granting

summary judgment where there was no record evidence that the interference at issue was improper); <u>ADW Incorporated v. The Lutheran Social Mission Society</u>, C.A. No. 86-5427, 1988 U.S. Dist. LEXIS 4397, *13 (E.D. Pa. 1988) ("To survive defendant's motion for summary judgment on this count of the complaint, plaintiffs must come forward with enough evidence to allow a reasonable jury to conclude that [the] conduct was improper.").  It is complainant's "responsibility to plead and prove the absence of such a privilege as an element of his cause of action." <u>Id. citing</u> <u>Thompson Coal Co. v. Pike Coal Co.</u>, 412 A.2d 466, 472 n.8 (Pa. 1979).  In the context of employer references, a conditional privilege does attach in the context of employer references. <u>Id.</u> (<u>citing</u> <u>Zuschek v. Whitmoyer Laboratories Inc.</u>, 430 F. Supp. 1163 (E.D. Pa. 1977) ("The parties agree that Pennsylvania . . . law recognizes the defense of a conditional privilege whenever a prior employer evaluates a former employee at the request of a prospective employer.")).  Where a conditional privilege is established in the plaintiff's case, as it has been established here, the plaintiff must prove the abuse of the privilege.[11] <u>Id.</u>, at 1161.

The "bad reference" alleged by Mr. Dela Cruz, even if proven to have been given, does not rise to the level of tortious interference because there is no evidence to suggest there was any abuse of the privilege, such as evidence of defamation.  The alleged statement by Ms. Neff to Mr. Dela Cruz that this reference was "bad" is meaningless, and is not evidence of improper interference.

As such, because there is no evidence to suggest Piccari abused its conditional privilege with respect to Mr. Dela Cruz's tortious interference claim, this claim must be dismissed with prejudice.

---

[11]    A conditional privilege can be abused if the defendant: (1) acts with malice or ill will, other than for protecting the particular interest for which the privilege is given; (2) does not believe in the truth of the statements; (3) although believing in the truth of the statement has no reasonable ground for so believing; or (4) makes a publication outside the scope of the privilege.  <u>Id.</u>

**B.      The Defendants Did Not Constructively Discharge Mr. Dela Cruz from Piccari**

Mr. Dela Cruz also asserts a constructive discharge claim, alleging that the Defendants subjected Mr. Dela Cruz to a racially hostile work environment in which the conduct and actions of the Defendants was so "unpleasant, intolerable and difficult" that Mr. Dela Cruz was forced to resign.  He bases that claim on the same "facts" of his discrimination and retaliation claims.

Constructive discharge protects employees from "calculated efforts [by an employer] to pressure [the employee] into resignation through the imposition of unreasonably harsh conditions, *in excess of those faced by her co-workers*."  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d. Cir. 1992) (emphasis added).  For an employer to be held liable on a constructive discharge theory, the employer must have knowingly permitted conditions of discrimination to persist so intolerable that a reasonable employee subjected to them would be forced to resign.  Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  The "intolerability" of working conditions is assessed by an objective standard – specifically, whether a reasonable person in the employee's position would have felt *compelled* to resign, and had no other choice but to do so.  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 975 (3d. Cir. 1998); Gray, 957 F.2d at 1079 (working conditions must objectively be "so unpleasant or difficult that a reasonable person in the employee's shoes would resign.")  The Third Circuit has emphasized that the law "does not permit an employee's subjective perceptions to govern a claim of constructive discharge." Gray, 957 F.2d at 1083.  Summary judgment is appropriate if a trier of fact could not reasonably conclude that a reasonable person in the plaintiff's shoes would have felt compelled to resign.  Hopson v. Dollar Bank, 994 F. Supp. 332, 340 (W.D. Pa. 1997).

The Third Circuit has highlighted several "factors" used by the court in assessing an employee's claim of constructive discharge.  Clowes v. Allegheny Valley Hosp., 991 F.2d 1159

(3d. Cir. 1992).   Among other factors, employees claiming constructive discharge typically allege that they have been threatened with termination, have been urged or subtly asked to resign or retire, have been demoted, suffered a reduction in pay, were involuntarily transferred to a less desirable position, had job responsibilities altered, or received unsatisfactory job evaluations.  Id.

Here, the only factors that credibly may apply are a reduction in hours.  As discussed in Section (III)(A)(3) of this Memorandum of Law, Mr. Dela Cruz was never demoted.  The law requires that Mr. Dela Cruz prove that he had been subject to these "intolerable conditions" because of his race and/or because he engaged in protected conduct.[12]  Mr. Dela Cruz admits that he resigned from Piccari during a typically slow time, and that his supervisor, Mr. Figorski, told him that he would get more hours as soon as they became available.  [Statement ¶60.]  Based on his own understanding of the cyclical nature of work in the printing industry, the reduced hours were not intolerable as required by Clowes.  Id., 991 F.2d 1159.   As explained earlier, the Defendants had a non-discriminatory and non-retaliatory business reason for the actions that Mr. Dela Cruz alleges were made on the basis of race and/or in retaliation for engaging in protected conduct.  See Massey, 269 F.3d, at 263.  Also as explained above, no pretext evidence exists to support the constructive discharge claim.  Accordingly, Mr. Dela Cruz's constructive discharge claim must be dismissed with prejudice.

### C.    Mr. DelaCruz's Racial Harassment Claims Cannot Survive Summary Judgment

Mr. Dela Cruz, based upon the same allegations, also claims racial harassment.  The elements of a Section 1981 and PHRA racial harassment claim are the same as the elements of a Title VII hostile work environment claim.  Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 94

---

[12]    As previously stated, the applicable standard is an objective one and Mr. Dela Cruz's opinion as to whether his job conditions rose to the level of "constructive discharge" is irrelevant. See Grey, 957 F.2 at 1083

(3d Cir. 2005) (unpublished opinion); <u>Ocasio v. Lehigh Valley Family Health Ctr.</u>, 92 Fed.

Appx. 876, 879-80 (3d Cir. 2004) (unpublished opinion); <u>Young v. Bethlehem Area Vo-Tech</u>

<u>Sch.</u>, 2007 U.S. Dist. LEXIS 13531, *24 (E.D. Pa. Feb. 28, 2007); <u>Reganick v. Southwestern</u>

<u>Veterans' Ctr.</u>, 2008 U.S. Dist. LEXIS 26726, at *11-12 (W.D. Pa. Mar. 19, 2008).

Accordingly, to establish a *prima facie* case for employment discrimination due to a

hostile work environment, a plaintiff must show: (1) that he or she suffered intentional

discrimination because of race; (2) that the discrimination was pervasive and regular; (3) that the

discrimination detrimentally affected the plaintiff; (4) that the discrimination would

detrimentally affect a reasonable person of the same race in that position; and (5) the existence of

respondent superior liability. <u>Ocasio</u>, 92 Fed. Appx. at 879 (citing <u>Aman v. Cort Furniture Rental</u>

<u>Corp.</u>, 85 F.3d 1074, 1081 (3d Cir. 1996)).  All of the racial harassment claims are based on the

claims of discrimination and harassment discussed above.  As set forth above, Mr. Dela Cruz's

*prima facie* case regarding his termination claim is defective because he can point to no evidence

which shows he unequivocally opposed actions taken against Mr. Brown which he perceived as

violative of Title VII.  Additionally, he was terminated for a legitimate business reason, and he

can show no pretext in relationship to the reason given by Tursack for his termination because he

was treated the same as a Caucasian employee.  Also as set forth above, Mr. Dela Cruz was

never demoted from a supervisory position at Piccari.  Regarding Mr. Dela Cruz's allegations

regarding his hour reductions, his hours were reduced for a legitimate business reason, and his

own testimony that he was highly cognizant of the fact that this was a slow time of the year in

the printing business further bolsters Piccari's explanation for the reductions.  For these same

reasons, Mr. Dela Cruz cannot establish a genuine issue of a material fact sufficient for his

harassment claims to survive Summary Judgment.

**D.**     **Mr. Dela Cruz is Not Entitled to  Punitive Damages**

Mr. Dela Cruz also fails to present evidence sufficient to allow a rational jury to conclude that he is entitled to punitive damages.  In Kolstad v. American Dental Ass'n, 527 U.S. 526, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999), the Supreme Court held that punitive damages may be recovered in claims under Title VII for cases involving intentional discrimination "'where the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or *with reckless indifference to the federally protected rights of an aggrieved individual*.'" Id. at 534 (quoting 42 U.S.C. § 1981a(b)(1)) (emphasis in original).

Here, during the time he was employed by Tursack and Piccari, Mr. Dela Cruz never filed a complaint pursuant to Tursack's anti-discrimination policy or Piccari's anti-discrimination policy (which he acknowledges he received) alleging that he had been discriminated or retaliated against or harassed based upon his race or based upon any protected conduct.  [Statement ¶¶38; 55-56; 72-73.]   In addition, Mr. Dela Cruz never complained to anyone at Tursack or the Defendants about discrimination, harassment, or retaliation.  [Statement ¶¶38; 73.]  There is simply no evidence that Tursack or the Defendants were even made aware of Mr. Dela Cruz's perceived injustices – much less any allegation that Defendants failed to take steps to remedy the situation.  Clearly, Mr. Dela Cruz cannot establish that Tursack or the Defendants acted with reckless indifference.  Therefore, Summary Judgment should be granted with respect to Mr. Dela Cruz's claims for punitive damages on his discrimination, harassment, and retaliation claims.

Additionally, while punitive damages are available for the claim of tortious interference with contractual relationships, Mr. Dela Cruz is not entitled to punitive damages on his claim. Pennsylvania has adopted Section 908(2) of the Restatement (Second) of Torts, which specifies the conditions under which punitive damages may be awarded.  Timberline Tractor & Marine,

Inc. v. Xenotechnix, Inc., 1999 U.S. Dist. LEXIS 5873, 12-13 (E.D. Pa. Apr. 27, 1999).  Under

the Restatement, punitive damages may be awarded "for conduct that is 'outrageous because of

the defendant's evil motives or his reckless indifference to the rights of others.'" Id. (citations

omitted).  Punitive damages may be awarded only if the act in question is malicious, "wanton,

reckless, willful or oppressive." Id. "Punitive damages may be awarded because of, and

measured by, [the defendant's] wrongful purpose or intent…"  § 908(2) RESTATEMENT (SECOND)

OF TORTS cmt. b (1979).  Punitive damages are penal in nature and so 'are proper only in cases

where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless

conduct." Fishkin v. Susquehanna Partners, G.P., 2008 U.S. Dist. LEXIS 47551 at *109 (E.D.

Pa. June 17, 2008) (holding an inducement to breach a non-compete contract absent evidence of

a specific evil intent was sufficient to permit punitive damages).

Here, even assuming *argumendo* that Piccari's "bad" reference affected Mr. Dela Cruz's

possible employment with Cadmus, he has proffered no evidence which demonstrates a specific

evil intent.  As such, summary judgment is appropriate with respect to Mr. Dela Cruz's claim for

punitive damages based on his tortious interference claim.

### E.    No Evidence Supports Mr. Dela Cruz's Allegations Supporting Liability Against CGX

A parent corporation generally is not liable for the wrongful acts of its subsidiaries.  Jean

Anderson Hierarchy of Agents v. Allstate Insurance Co., 2 F. Supp.2d 688, 691 (E.D. Pa. 1988)

(parent corporation is not normally liable for wrongful acts of subsidiary simply because parent

wholly owns subsidiary); see also Martin v. Safeguard Scientifics, Inc., 17 F. Supp.2d 357, 363

(E.D. Pa. 1998) (noting strong presumption parent is not employer of subsidiary employees).

"The alter ego concept is a 'tool of equity' which should be utilized by the courts only on clear

and convincing evidence of 'fraud, illegality or injustice, or when recognition of the corporate

entity would defeat public policy or shield someone from public liability for a crime.'' <u>UFCW v. Fleming Foods East, Inc.</u>, 2000 U.S. Dist. LEXIS 12685, at *27-28 (D.N.J. 2000) (internal citations omitted).

In order to be subject to liability under Title VII, a defendant must: 1) fall within Title VII's statutory definition of "employer"; and 2) have exercised substantial control over significant aspects of compensation, terms, conditions or privileges of plaintiff's employment. <u>Magnuson v. Peak Technical Services, Inc., et al.</u>, 808 F. Supp. 500, 507 (E.D. Va. 1992).  The mere fact that one company is a wholly-owned subsidiary of another is insufficient to establish that they are a single employer under Title VII.  <u>Wayne v. The Dallas Morning News</u>, 78 F. Supp.2d 571, 578 (N.D. Tx. 1999); <u>see</u> <u>also</u> <u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497, 514 (3d Cir. 1996) (dismissing claims against parent corporation for lack of evidence of parent's involvement in management of personnel decisions).

Rather, parent corporation liability in the context of an employment discrimination case depends on whether a subsidiary is a mere instrumentality of its parent as determined by the following factors: 1) is there functional integration of the operations of the parent and subsidiary; 2) are labor relations centrally controlled; 3) is there common management; and 4) is there common ownership or financial control.  <u>Kemether v. Pa. Interscholastic Athletic Ass'n</u>, 15 F. Supp. 2d 740, 749 n.5 (E.D. Pa. 1998); <u>see</u> <u>also</u> <u>Marzano</u>, 91 F.3d at 514 (applying "integrated enterprise" test).  Mr. Dela Cruz can point to no evidence that would overcome the strong presumption that CGX was not Mr. Dela Cruz's employer while he worked at either Tursack or Piccari.

Because Mr. Dela Cruz can show no facts that establish CGX as his "employer" for purposes of Title VII or to defeat the presumption that CGX, Tursack, and Piccari are all separate

corporations for liability purposes, the Complaint against CGX must be dismissed with prejudice.

**IV.** <u>**CONCLUSION**</u>

The allegations in Mr. Dela Cruz's Complaint, like his various resumes, misstate the facts of his employment with Tursack and Piccari. The evidence in this case completely fails to support his allegations. Thus, Summary Judgment is required.

Respectfully Submitted,
**DILWORTH PAXSON, LLP**


By:  //s//Marjorie M. Obod
     MARJORIE M. OBOD, ESQUIRE
     Attorney I.D. No. 47531
     KATHARINE V. HARTMAN, ESQUIRE
     Attorney I.D. No. 203697
     3200 Mellon Bank Center
     1735 Market Street
     Philadelphia, PA 19103-7595
Dated: July 16, 2008        (215) 575-7015